CHARLES KEVIN KELLY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kelly v. Commissioner
Docket No. 31271-84.
United States Tax Court
T.C. Memo 1987-89; 1987 Tax Ct. Memo LEXIS 85; 53 T.C.M. (CCH) 133; T.C.M. (RIA) 87089; February 12, 1987. Lawrence J. Hracho and J. Peter Landis, for the petitioner. Melvin E. Lefkowitz, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined a deficiency in petitioner's 1983 Federal income tax in the amount of $20,321 plus additions to tax in the amount of $1,016 and 50 percent of the interest due on $20,321, pursuant to sections 6653(a)(1) and (2), [1] respectively. *86 The issues for consideration are: (1) Whether respondent correctly reconstructed petitioner's taxable income for 1983; (2) whether petitioner is liable for self-employment tax for 1983; and (3) whether petitioner is liable for additions to tax under sections 6653(a)(1) and (2). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. At the time the petition herein was filed, petitioner was incarcerated at Graterford, Pennsylvania. On March 7, 1983, a complaint was filed against petitioner charging him with criminal attempt homicide, involuntary deviate sexual intercourse, aggravated assault, simple assault, kidnapping, unlawful restraint, conspiracy, recklessly endangering another person, false imprisonment, indecent assault, and knowing or intentional possession of controlled substances. As a result of these charges a criminal complaint was brought *87 against petitioner and he was arrested. Bail was set at $500,000 and could be satisfied by posting 10 percent in cash. On June 1, 1983, the $50,000 cash bail was posted for petitioner in the form of a cashier check. [2] The check was purchased through the office of petitioner's criminal defense attorney from funds delivered by petitioner's father, Robert Kelly (Mr. Kelly), and Vincent Perry (Mr. Perry). [3] On June 8, 1983, an additional $2,500 in cash bail was posted for petitioner concerning a separate assault offense which allegedly occurred while petitioner was in prison. [4] Messrs. Kelly, Iacona, and Kazarian testified at trial with respect to the source of these funds. On July 29, 1983, petitioner was found guilty of many of the charges filed against him in March 1983, including possession of drugs *88 and possession of drug paraphernalia. He was sentenced to a term of 10 to 25 years in prison and is currently serving that sentence. Subsequent to this conviction petitioner's bail was revoked and $42,000 of the $50,000 was returned to petitioner's attorney. The returned bail remains in the custody and control of petitioner's attorney. At the time of his 1983 arrest, petitioner was in the process of purchasing real estate located at Ormond and Market Streets, Linwood, Pennsylvania. On or about January or February 1983, petitioner made a cash deposit of $10,000 towards the purchase of a building. [5] He also owned a 1973 Cadillac, a Chevy coupe, [6] and a 1976 Harley Davidson. Petitioner kept no books or records of his business activities. Respondent, based in part upon evidence of petitioner's involvement with illegal activities, reconstructed petitioner's 1983 taxable income under the cash expenditures method to include the $52,500 cash posted as bail. [7]
*89 Other evidence of petitioner's illegal activities includes an arrest that was made on February 26, 1979, for possession with intent to deliver methamphetamine and possession of hashish. This arrest was made after search warrants were issued for (1) an apartment located at 7421 Society Drive, Claymont, Delaware, known to be used by petitioner; and (2) an apartment located at 20 South John Street, Newport, Delaware, known to be occupied by petitioner. The search of the apartments produced drugs and drug paraphernalia seized from 20 South John Street and a quarter-pound of suspected methamphetamine seized from 7421 Society Drive. Consequently, in August 1979 charges were filed against petitioner and subsequently petitioner pled guilty to these charges and was convicted of possession with intent to deliver methamphetamine and possession of hashish. After the close of the 1983 taxable year petitioner filed a return for the entire year showing adjusted gross income of $400. [8] Respondent, who had initially terminated petitioner's taxable year on June 8, 1983, [9] and determined a tax deficiency of $19,712, by statutory notice dated June 8, 1984, recomputed petitioner's income tax deficiency *90 to be in the amount of $20,321. OPINION The first issue for our consideration is whether respondent, by including the cash bail amounts, correctly reconstructed petitioner's 1983 gross income. Respondent contends that the bail amounts are taxable income to petitioner which he earned from his illegal activities. Petitioner, on the other hand, contends that respondent's method of reconstructing his income is unreasonable; he further argues that the amounts he used to post his bail were loans he secured from his relatives and friends. Initially, we address the issue of respondent's use of the cash expenditure method to reconstruct petitioner's income. Section 6001 requires all taxpayers to keep sufficient records to enable respondent to determine their correct tax liability. In the absence of such records respondent is authorized by section 446 to compute the taxpayer's income by any method that, in respondent's opinion, clearly reflects such income. See ; *91 , affg. a Memorandum Opinion of this Court. Respondent is given great latitude in adopting a method for income reconstruction, ; such method only need be reasonable in light of all surrounding facts and circumstances. . We find that respondent's use of the cash expenditure method in the present case is reasonable. Petitioner kept no records of his illegal activities, and failed to establish any credible nontaxable source for $45,000 of the $52,500 used for his bail. Petitioner did not present any evidence of meaningful legal employment. [10] Moreover, in connection with the August 1979 charges, petitioner pled guilty to possession with intent to deliver methamphetamine and possession of hashish. On July 29, 1983, petitioner was again found guilty of, among other charges, possession of drugs and drug paraphernalia. Petitioner did not file income tax returns for at least the five years preceding 1983, however, sometime in January or February 1983, petitioner advanced $10,000 *92 in cash towards the purchase of a building. In addition, at the time of his arrest in March 1983, petitioner owned three automobiles. In the absence of petitioner establishing a more accurate method of determining his source of income, respondent's method is sustained. We now turn to the issue of whether the bail funds constitute loans to petitioner. It is a well-established principle that loan proceeds do not constitute income to the borrower when received. However, petitioner has the burden of proof and must overcome the presumption of correctness attached to respondent's determination by proving that the bail amounts were the proceeds of loans. ; Rule 142(a). In determining whether payments are considered loans, the controlling factor is the intent of the parties. ; see also , *93 affg. a Memorandum Opinion of this Court. The intent of the parties does not merely relate to the name or form of the transaction but, rather, to the existence of a good-faith intent on the part of the recipient of the funds to make repayment and a good-faith intent on the part of the person advancing the funds to enforce repayment. ; ; , affg. . Judicial ascertainment of a party's subjective intent or purpose for motivating certain actions is often difficult; thus the party's true intention is to be determined not only from direct testimony but from considering all facts and circumstances as well. , affd. without published opinion , cert. denied . An essential consideration in making this determination is whether in light of the economic realities of the situation there was a reasonable expectation of repayment. ; *94 . Mr. Kelly, Mr. Kazarian and Mr. Iacona appeared as witnesses for petitioner with respect to the issue of loans. Both Mr. Kazarian and Mr. Iacona testified that they made loans on petitioner's behalf to be used towards his bail. We give little weight to their testimony because we find it questionable. See . Mr. Kazarian and Mr. Iacona both testified that they did not directly loan petitioner any funds but, rather, gave funds to Mr. Perry to be used on petitioner's behalf. According to their testimony, they were contacted by Mr. Perry who notified them that petitioner was being held in prison and needed to raise $50,000 for bail. Mr. Kazarian testified that he had some cash around the house from which he gave Mr. Perry $5,000 to be used towards petitioner's bail. He further testified that about one week later he advanced $500 on petitioner's behalf as part of the $2,500 bail posted on June 8, 1983. Mr. Iacona testified [11] that he had some money at home, he borrowed some and got some from his wife, to come up with the $5,000 he allegedly loaned petitioner. *95 Both Messrs. Kazarian and Iacona testified that they each delivered $5,000 in cash to Mr. Perry to be used for petitioner's bail. At no time did either of them speak directly with petitioner about lending him the money nor did petitioner contact either of them seeking to secure a loan. Furthermore, neither Mr. Kazarian nor Mr. Iacona could testify that they were sure the money allegedly given to Mr. Perry reached petitioner. Neither of them produced any evidence of an existing debtor-creditor relationship with petitioner. Mr. Kazarian testified that he had never transacted any business with Mr. Perry before, yet he delivered $5,000 in cash to him without securing any evidence of the debt, or obtaining any enforceable assurances about the repayment of these funds. Mr. Iacona testified that he knew Mr. Perry growing up as a kid; however, he also testified that he was aware of Mr. Perry's trouble with the law. Notwithstanding this, Mr. Iacona delivered $5,000 in cash to him without securing any evidence of the debt, *96 or obtaining any enforceable assurances about the repayment of his money. We find it difficult to believe that Mr. Kazarian, being a businessman most of his life, [12] and Mr. Iacona, a man then currently engaged in business, [13] would conduct business in such an informal manner had they intended to create a genuine debtor-creditor relationship with petitioner. [14] Neither Mr. Kazarian nor Mr. Iacona appeared to have any intention of enforcing repayment of these alleged loans; neither did petitioner show any intent to repay the same. [15] Moreover, in light of the economic realities of the situation, without their knowledge of other sources of income to petitioner, neither Mr. Kazarian nor Mr. Iacona had a reasonable expectation of repayment. See ; *97 We note that Mr. Perry, the major link in the transaction, failed to appear and testify with respect to the receipt of funds from Mr. Kazarian or Mr. Iacona, and more importantly, to establish that the funds he delivered to the office of petitioner's attorney constituted a loan to petitioner. [16] The only evidence available to us on this issue is petitioner's self-serving assertions that the funds were intended to be loans. Accordingly, we hold that petitioner has failed to carry his burden of proof with respect to the funds received through Mr. Perry. Mr. Kelly testified that when he heard about his son's arrest he advanced him $7,500 initially as a retainer for the attorney, but when he was unsuccessful in obtaining the services of that particular attorney he intended the $7,500 to be used towards his son's bail. He testified that he wanted the money to be used as bail because he would get it back sooner than if it was used to pay the attorney. He also testified that the *98 $7,500 was taken from funds he had earmarked for other purposes. Unlike the other parties who allegedly advanced funds on petitioner's behalf, Mr. Kelly wrote a check and personally delivered it to the attorney's office. We found Mr. Kelly to be a credible witness, therefore, we find that he intended to advance the $7,500 to petitioner to be used towards his bail. Consequently, $7,500 of the money used to post petitioner's bail is excluded from petitioner's income. Petitioner contends that respondent erroneously included $3,889 as cost of living expenditure. We find that this represents a reasonable allowance of $10.65 per day. In the absence of evidence that petitioner expended less than the amounts determined, we must sustain respondent's determination. [17]
We now consider whether respondent erroneously determined self-employment *99 tax against petitioner. Section 1401 imposes a tax on income earned from self-employment which respondent determined to be applicable in this case. Petitioner has the burden of proving that the cash he used as bail was not earned in a trade or business conducted by him. Rule 142(a). Petitioner has failed to carry his burden of proof in this regard. [18]. We, therefore, sustain respondent on this issue. Respondent determined additions to tax under sections 6653(a)(1) and (2) due to the understatement of income for 1983. Petitioner has not *100 carried his burden of proof with respect to these additions, and accordingly, we must sustain respondent on this issue. Rule 142(a); To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue. All rule references are to the Rules of Practice and Procedures of this Court.↩
2. A copy of the $50,000 bail receipt shows petitioner as the surety of the bail. ↩
3. The relationship between petitioner and Vincent Perry was not established. We can only assume it was either a social or informal business relationship. ↩
4. Although the record does not include a copy of the $2,500 bail receipt, we assume that petitioner was also the surety for this amount.↩
5. We note that these funds are not included in respondent's recomputed taxable income figure, nor does respondent argue for such inclusion. ↩
6. The age of the Chevy coupe could not be determined from the record. ↩
7. Respondent reconstructed petitioner's income as follows: Cash bail posted June 1, 1983
$50,000 Cash bail posted June 8, 1983
2,500 Cost of living *
3,889 Total income
56,389 Less: Exemption
$1,000
Return as filed
400
<1,400>
Taxable Income
$54,989 Taxes due under tax rate schedules
16,983 Self-employment tax **
3,338 Total deficiency
$20,321 * Cost of living expenditure is based upon the Department of Labor statistics. ** Self-employment tax computed as follows: ↩
Maximum income subject to self-employment
$35,700
self-employment tax rate
X .0935
self-employment tax
$ 3,338
8. Petitioner did not file individual income tax returns for at least the five years preceding 1983. ↩
9. Petitioner's taxable year commenced on Jan. 1, 1983.↩
10. In light of petitioner's access to large sums of cash and the assets he owned at the time of his arrest, it is not unreasonable for respondent to argue that petitioner had a substantial source of income.↩
11. Mr. Iacona testified that he could not remember who told him that petitioner was being held in prison until bail was posted, but believed it was Mr. Perry.↩
12. Mr. Kazarian testified that he was once in the linen business. ↩
13. Mr. Iacona testified that he owned the Interstate Supply Company with another partner. ↩
14. Messrs. Kazarian's and Iacona's alleged use of cash casts further doubt on their testimony since there is no documentary evidence of payment, and no other corroboration to their testimony was offered. Considering the record in this case, we would even have difficulty finding that either Mr. Kazarian or Mr. Iacona paid any money over to Mr. Perry. ↩
15. No testimony or evidence was offered to show what efforts, if any, were used by Messrs. Kazarian or Iacona to seek return of any payment from the returned bail being held by petitioner's attorney.↩
16. Mr. Natalie, an attorney with the firm of petitioner's attorney, testified that when the cash delivered by Mr. Perry was counted in the office it was actually $50,020 and not $50,000 as intended.↩
17. Petitioner contends that because he lived at home for the most part of 1983 cost of living expenditures should not be included. We find this to be unreasonable, especially in light of the relatively reasonable amount the cost of living expenditure averages out per day and Mr. Kelly's testimony that he often did not know petitioner's whereabouts.↩
18. Respondent put forth a witness, a convicted felon who was brought out of jail to work undercover for the Drug Enforcement Administration (DEA) and the FBI. The witness' testimony was attacked, however. He testified that petitioner gave him $50,000 in cash in part payment for nine pounds of methamphetamine and promised to pay the remaining $31,000 the next day. This was part of a sting operation conducted by the DEA and the FBI. The witness further testified that throughout the entire deal petitioner appeared to be working for himself; not as the agent for another individual.↩